We have four cases this afternoon. The first is number 23-19-20, United Services Automobile Association v. PNC Bank. Mr. Zimmer. Good afternoon, your honors. It may please the court. David Zimmer on behalf of USAA in the first of these appeals, which involves the 559 patent. The board in this case committed two legal errors. First, it misapplied the motivation to combine framework, and second, it misconstrued the accepting limitation. And I'd like to focus first on motivation to combine. The fundamental legal error in the board's decision is that it found that a skilled artisan would have been motivated to combine the Randall and Garcia references while disclaiming the need to make any finding concerning how often a skilled artisan would have expected that combination to actually work. That is wrong as a part of law. Put simply, a skilled artisan cannot have been motivated to combine Randall and Garcia if a skilled artisan would not have expected that that combination would result in a usable invention. So you're saying it has to assume that it would always work in order for there to be a substantial enough motivation? No, not at all, your honor. I think that our argument is just that there has to have been an expectation that it would work in a way that would have motivated a skilled artisan to make the combination. So if you think about it, if we were in the field, it depends on what that would look like. So what is your argument? What you just said made me think that you were saying it wouldn't always work. What was? So I think it depends on the field, right? So if you imagine we're talking about a cure for a rare form of cancer, right? I think at that point, if a skilled artisan would have expected that a combination would work 5% of the time, there probably would be a motivation to make that combination. If you're talking about a combination that would have expected to result in a plane that made it from point A to point B without crashing 5% of the time, there's not going to be a motivation. But I don't read the board's decision the same way you do. I regard their statement that it happens sometimes to be a kind of a throwaway alternative at the end. I view them as having said that the combination would generally work. Well, I guess I don't read it that way. And I think it's pretty clear that that's not what they were saying. If you look at pages 36 to 37 and page 44, I think it's on 37 that they say, even if it wouldn't usually work, it doesn't matter. All that matters is that it would work sometimes. And I think that is really the foundation of what the board proceeded to say about Garcia, because nothing in Garcia, you know, at best, I think all the board read Garcia to do is teach that it would work sometimes, but not often. And I think that that's really the only way you could read Garcia, because Garcia doesn't actually... Yes, Judge Cunningham, sorry. So how often do you contend that it would need to work? It sounds like following up on Judge Post's question, you're not saying always, but how frequently are you contending it would need to work? Well, I think it would need to work, you know, frequently enough that a skilled artisan would have expected, would have found it to be desirable. And I think those are, there's obviously, those are findings that the board needed to make and explicitly disclaimed the need to make. And I don't think, we're not asking, saying there's some specific number the board needed to find, but what it needed to find was, here's what a skilled artisan would have needed to find a motivation. And they would have expected to be able to hit that target. And what the board did is they just said, they just bypassed the entire inquiry. And that's, I think, particularly problematic, because the board actually agreed with us on pages 39 to 40, that a skilled artisan would have recognized significant and ultimately insurmountable problems with the... Well, there's a notion called obvious to try. And what the board said at the bottom of page 36 is we need not decide how often the system would have successfully deposited the check, because claim one simply requires the system to have the capability of performing the recited limitation. And you think that's wrong as a matter of law? I mean, yes, Your Honor, because I think as cases like Nuvasiv show, to show obviousness, it's not enough to show that all the limitations were disclosed. There has to be some affirmative reason that a skilled artisan would have thought to make the combination. And here, the evidence was really, the board accepted the evidence. But that goes through the traditional obviousness analysis. If you left off that remark about it only has to work some of the time, it would be a perfectly fine decision. There's nothing wrong with it. Well, no, again, I disagree with that, because I think that the way that the board read Garcia was really based on this legally flawed statement about it doesn't matter how often it works. So let me just talk about Garcia a little bit, because what Garcia discloses, and I think it's important to be very clear about what Garcia does and doesn't disclose. So yeah, it discloses the use in some way of a mobile phone image of a check in the check deposit process, but it's very clear that it doesn't disclose, doesn't even suggest that you could use that image to extract all of the relevant information, and especially the check amount. So Garcia states over and over again, and I think the clearest statements are on 1385 and 1392, that the user has to enter the check amount, and the board agreed with this. The board, if you look at pages 30 and 43, the board characterized Garcia as requiring the user to enter the amount of the check. Garcia never even suggests that the images that it was talking about were of enough quality that you could apply OCR to extract the check image. Yes, please. Does Garcia disclose OCR? So it discloses what Garcia says about OCR. There's one reference to it at page 1391 that says that the computer at the bank has to have the capability to do OCR, but it doesn't really say anything about what exactly you would do. And it, I think, makes very clear that what you couldn't do, or that Garcia certainly didn't envision, that you would use that OCR to extract the check amount, because Garcia says over and over that the user has to enter the check amount. I mean, it's very clear about this. At 1385, Garcia says that the user enters data associated with the document itself, such as the amount. Same at 1392. And the board didn't disagree with that. The board also, at 30 and 43, says Garcia teaches that a user enters data associated with the check, such as the amount. So I think Garcia is very clear that at least it's the check amount that's being entered by the user. And so Garcia is really consistent with all of the other evidence that the board credited from Lev and from PNC's own experts that nobody thought in 2006 that you could take a mobile phone image of a check and have any hope in any kind of reliable, regular way. But there was testimony by Noble that you could, right? No, there was testimony by Noble that a mobile phone was capable of taking pictures of sufficient resolution to meet the thing in Randall. But resolution was only one of numerous issues that are identified. If you look at Lev, I think Lev is the best example. And you had no expert testimony, right? Well, we had PNC's own experts' testimony, which was honestly better than any expert testimony that we could have… There's a question as to whether that's even admissible under the federal rules of evidence. Well, the board admitted it. That wasn't, I mean… No, but if the board could have excluded it, the fact that it gave it very little weight seems consistent with the federal rules. Well, so first of all, I mean, even the board said that it gave it very little weight, but it actually described the testimony in a good deal of detail, and it didn't give it no weight. And ultimately, again, the board's findings at pages 39 to 40 are entirely consistent with that testimony and entirely consistent with Lev, which certainly was admissible. And Lev was, again, PNC's own reference. I understand what you're saying. I mean, they're consistent with the testimony. My recollection is they said that the testimony, if it had weight, simply showed that it was challenging to take a mobile image on the phone and use it for deposit. Well, right. I mean, what the board said, I mean, is that it went through and listed all the problems. It summarized all of PNC's experts' testimony. It summarized Lev, which described these images virtually useless for computer readability. And then the board said that there would have been significant challenges with lighting, skew, rotation, and that those challenges couldn't have been overcome with existing algorithms. And the reason that the – They said the challenges couldn't have been overcome? I mean, what they said – Where did they say that? This is at 39 to 40. They said the board found – this is a direct quote – that the existing algorithms were not able to reliably and consistently correct these problems in images actually captured by users and working systems, end quote. That's a direct quote from the board. So, again, I think that the way that – the only way to – Where is that quote? I'm looking at 38 and 39. No, it's at the bottom. I think it's at the bottom of 39 or at the top of 40. But I think it's the bottom of 39. And, again, it says that – It's at the top of 40. Top of 40. Sorry. Sorry, Your Honor. But – and I think that the way – like, the only way to really read the board's conclusion in light of that discussion on 39 to 40 is to go back to what it said at pages 36 to 37 and on 44 where the board said, look, all that matters is whether a skilled artisan would have thought this would ever work, even if it didn't usually work. You know, that's the way the board reconciled all of this. But, look, they say on that same page, we are nonetheless persuaded that an ordinary skilled artisan would have reasonably expected that the check image captured by Garcia's mobile device with integrated camera can be processed by Randall's check processing system. I mean, again, but if you go back to 36 to 37, what they're saying is that it can be processed sometimes while disclaiming the need to make any finding as to how often it would be processed. I mean, that – Isn't it a little backwards? I mean, you don't know at the time. Their motivation to combine, you're saying the only motivation is if you know that it's going to consistently or always perform the function as I would like it to perform. Well, you don't need to always know, but you need to have an expectation that it will work, that it will actually be usable, right? And so, again, we're not saying they needed to expect it to work 100 percent of the time. We need to – they just need to make a finding that it would have worked sufficiently reliably to actually be worth making the combination, right? I mean, just to take an extreme example, right, if a skilled artisan would have expected that, you know, once in 10,000 times it would have worked, obviously nobody would make – that's useless, right? Nobody would have expected that. And what about the concept of the obviousness to try? That doesn't require any certitude that it's going to work effectively most or a lot of the time. Well, I mean, I don't know that that's true, Your Honor. I mean, if something's not obvious to try, I don't think something would be obvious to try if there's no expectation. I mean, you know, if there's no expectation that it would ever – Most of the time? I don't know. I mean, again, I think that there has to be some finding, you know, that there has to be some finding that a skilled artisan would have had some expectation that trying it would work. And, again, the Board just didn't – That's not an accurate characterization. Some understanding that it would work. Or some expectation, sorry. Some expectation. I mean, the Board's opinion is filled with findings that this combination would work and would enable a deposit by using a mobile phone. I mean, I don't read it that way, and I think that if that were the case, I don't know why the Board would have had this discussion where they effectively credited all of the evidence that we relied on, including Lev and including their experts' testimony, and had this paragraph on 39 to 40 where they acknowledge all of these challenges that mobile phone images would have – that artisans would have expected from mobile phone images. You know, I think that this would be a different case if the Board had somehow said it. I don't think they really could have said this on this record. But if the Board had said, no, a skilled artisan would have had no concerns at all that mobile phone images could have worked in Randall because mobile phone images were great and everybody knew they were great. That's not what they found, and they couldn't have found it on this record because, again, you had – you know, Lev is their reference, and it describes – says that skilled – you know, it says that mobile phone images of checks would have been virtually useless for many of the purposes for which they typically serve, and a piece of art that was all about – that was all about, you know, reading data from documents. And so I just – I don't think the Board could have made that conclusion on this record. And without a finding like that, without finding that a skilled artisan would have expected these images to be usable to extract things like the check amount, I just don't see how you could find a motivation to combine here. And that's why I think that this legally erroneous approach was so important. But just spending one more minute on this question of the admissibility of the testimony, the expert testimony from the district court proceeding. Yeah. As I understand the federal rules of evidence, you can't just take testimony from another proceeding and introduce it. Well, obviously, I don't – I mean, I could be mistaken about this, but I don't think that the federal rules of evidence, you know, necessarily apply. Well, they do apply. I mean, there was no – there was no – Well, but they weren't – I mean, there was no objection that these documents were – No, but I'm asking a question. I mean, it's your burden here to show that they made an error. And I'm asking you, isn't it true that they could have excluded this testimony from the other proceeding entirely? I mean, I – I mean, in all honesty, I'm not – I mean, well, I think what the important point is is that they didn't exclude it. And I don't think that it would be a basis, for instance, for affirming or rejecting a district court decision for this court of evidence that was admitted and there was no objection to the admission. It was before the court, and it was relied on. And, again, that just wasn't the basis for the board's decision here. The board didn't say this evidence wasn't admissible. The board considered the evidence. It had this – what I think is another error in saying that it was not entitled to very much weight because it was given in the context of enablement. I mean, that was the board's only basis for discounting that testimony. And that's just wrong for, you know, the reasons in our brief. This wasn't really testimony about enablement. It was a testimony about the state of the art at the time. But, again, I don't think the court could say – could affirm on the basis that the board could have but did not exclude testimony that it actually considered and gave some weight to. All right. I think we're out of time. Does Judge Cunningham have further questions? Not hearing. Thank you very much. Oh, I have one question. No, no. I think you originally were going to talk about the plane construction. I'm just going to ask you one question on that front. Yeah. Do you agree that the board found the planes obvious under the proposed construction? Do I agree that the – I agree that the board did make that – yes, they did find them obvious under our construction. We disagree with that, obviously, but they did find them.  We'll give you two minutes for rebuttal. And just to alert counsel, because of the remote aspect of this argument, just be conscious when Judge Cunningham indicates by raising her hand that she has a question to stop and listen to her. Thank you. I'll take a peek over there periodically. Good afternoon. Good afternoon, Mr. Durford. Good afternoon. May it please the court. Andrew Danford on behalf of PNC Bank. The board carefully considered all the record evidence and issued an 87-page final written decision finding all claims of the 559 patent invalid for obviousness. While USA now disagrees with how the board ultimately weighed the evidence, it's failed to show that any of the board's factual findings lacked substantial evidence. And let me start with this issue on the motivation to combine Garcia and Randall. The board found a motivation to combine based on several things, first starting with the disclosure of the references themselves. The board found that Garcia, which is a reference from 2003 titled Method of Transmission, Authentication, and Automatic Processing of Digitized Documents, was all focused on how you'd submit checks that are captured by a mobile phone to a bank. They receive the image of the check, process it, and that's how you do the check deposit. Garcia explains that when the bank receives those images, it should extract relevant information from the checks using optical character recognition. That's on appendix page 1391. And Garcia further explains that the check image is processed by, quote, the usual means, truncation systems. PNC's expert, Dr. Noble, opined that the Randall prior art discloses exactly what Garcia is referring to in terms of the usual means, truncation systems. The board credited those opinions as supported by the disclosures of Garcia and Randall, and it in fact noted that there was no evidence in the record that a person of ordinary skill in the art would have processed check images captured by Garcia in any other way. And that's not a coincidence. USAA didn't offer any expert testimony from its own witnesses in this proceeding. There just isn't evidence on the other side of this issue, and the board... Well, what about the evidence they rely on from the district court proceeding? Sure. The board considered the evidence from the district court proceeding and discounted it for a couple of reasons. One being the board had the express disclosure of mobile check deposit from Garcia, which is a written disclosure contemporaneous from the relevant time period, and it reasonably concluded that it should assign much more weight to those contemporaneous documents than to what experts were saying, addressing other issues in a different proceeding. And so this is just a classic example of the board weighing evidence in its role as fact finder, deciding to give certain evidence greater weight than others. Can I take you back to the point you started with and the one we spent most of our time with, Mr. Zimmeron, which is what the board said at 37 or 36 in those pages, where it appeared to acknowledge that this was unlikely to work, or at least work effectively, much of the time, and how that should affect our analysis of motivation. I don't think that the board said that it wouldn't work most of the time. There's that one throwaway line that Judge Dyke referenced earlier, but that comes at the end of a very long discussion where the board gives its reasons for why a person of skill and merit would expect it to work. And I direct your attention to appendix page 35. The throwaway line? I don't know. Maybe there's more than one. But the throwaway line, we need not decide how often the system would have successfully worked. What I understood the throwaway line to mean is on appendix page 37, where the claims do not require a system that always does so, and then in parentheses, or even usually does so. I don't think the or even usually does so is necessary to the board's decision. It was addressing USAA's argument. Because remember, this came up in the context of USAA criticizing Dr. Noble's opinion, saying Dr. Noble should have addressed how often this would work. And the board said, well, your claims don't recite a certain threshold. And there's a reason for that. These claims don't claim an improvement over some prior. They just generically claim mobile check deposit with the steps that a bank would do to process those deposits. So there's nothing that's disclosed or claimed about how you improve this. This is not about achieving a certain level of operability or an improvement over operability before. It's just doing mobile check deposit. Well, I guess the point is that if it didn't work some reasonable amount of time, that there wouldn't be a motivation to combine because there wouldn't be a reasonable expectation of success. That's correct, Your Honor. And what the board concluded was that a person of skill in the art would expect this to work a reasonable amount of time based on the disclosure of Garcia. Where did they say that? I direct you to appendix page 35. As a result, Garcia is strong evidence that a person of ordinary skill in the art would have expected to be able to remotely deposit a check using a mobile phone. So that's based on the disclosure of Garcia and the fact that Garcia is all about depositing checks with images captured from a mobile phone. I did want to come back to the issue about what Garcia's disclosure actually is. Because Garcia, I don't think that USA is accurately characterizing this and their arguments are certainly not consistent with the board's findings. The board found that Garcia expressly discloses using OCR to process the check images and that the most reasonable interpretation of Garcia is that it discloses reading that information off the face of the check. For example, the bank routing number. The reference to the user entering the amount is just one embodiment of Garcia, right? That's correct. Entering the amount is one embodiment and it's not to the exclusion of automatically processing or reading the information off the check with OCR. USA's own patent discloses the user entering the amount. In fact, one of the claim limitations is that you compare the user entered amount to the amount that's read off the check. So that entering the amount is not to the exclusion of doing this automatic processing that Garcia discloses. And I would also like to address the arguments with respect to Lev. This, again, is about how the board weighs the evidence. I believe the passages that USA relies upon with respect to the Lev reference relate. Yes, Judge Cunningham. What is your response to USA's argument that Lev shows that Randall and Garcia were mutually exclusive? I don't think that Lev shows that. I think that the part of Lev that USA is focused on talks about capturing full page images of the documents. And we're not talking about the challenges of a full page when you're dealing with a check, which is much smaller than that. And Dr. Noble offered opinions on that and compared it to the size of the areas that are captured by Lev. I'd also direct your attention to appendix page 74, which is where the board addresses Lev. And it actually, it rejects USA's argument and finds that the disclosures in Lev, because Lev is ultimately about using a mobile phone to capture document images and says you can do this, here's how. And makes the finding based upon that, that if anything, Lev teaches toward the invention of the 559 patent, not away from it. So I don't think that USA's arguments are supported by Lev and certainly aren't supported by the board's findings. While I have you, let me also ask you a follow-up on some of the questions that I want to say both Judge Prost and Judge Dyke were asking. Following up on what your opposing counsel said about how frequently a mutual work is somewhat dependent on field, what is your take on that particular point that he raised in the opening argument? I do think that's true, that it is field dependent, but the board made the finding that in this field, based on the disclosures of Garcia, a person of skill in the art would reasonably have expected this to be able to work to deposit a check. And again, I direct your attention to the discussion on appendix page 35 and the discussion surrounding that, where the board really does dig in on the disclosure in Garcia. And again, we're not relying on a motivation to combine for the teaching of using a mobile phone to deposit a check. That is all contained within the express disclosure of Garcia. The question is, when you have that express disclosure of use a mobile phone to capture an image of a check and process it for deposit, how do you actually process the deposit? Garcia says use the usual means, truncation systems. Dr. Noble opined that Randall is such a system, a truncation system, and the board accepted those findings as supported by the disclosure of the references. So we think this is a straightforward case based on the express teachings in the art and that the board's findings are amply supported by the record. Unless you have further questions for me on motivation to combine, I'll just briefly touch on the accepting issue. And there are multiple layers here. USA has to prevail on all of them, and its arguments should be rejected with respect to each step. So the first step, of course, is what the actual claim construction of accepting is. I find the accepting limitation to be rather puzzling, because I don't know how a device can control whether another bank accepts the image for deposit purposes or not. I mean, it doesn't make a lot of sense in that respect. Just to take a step back, USA's position has been, and I don't think the parties are disputing this, that the computing device that's recited in the preamble can be multiple servers in different locations. That's what USAA said. If you look at appendix page 14, the board discusses USAA's position on that. And I think that if you start from the proposition that we're already talking about multiple servers that can be in different places, there's no reason why the accepting has to refer only to the payee bank. Remember, it's not accepting the deposit. The deposit doesn't have to be completed. It is accepting for deposit. And there are a number of banks involved in the process of accepting a check image for deposit. That's shown in figure 1 of the 559 patent, where there's bank 130, 140, and 150. There's that cloud that has the lines that come out of it that go to the different banks. Columns 5 and 6 of the 559 patent describe the roles of those different banks in the check deposit process. And so once you're already at the point where you have multiple servers in different locations, there's nothing that limits this to just the payee bank. Other banks are involved in the check deposit process, as described in the patent. But I think that the actual resolution of the claim construction is beside the point, because the board actually accepted, for the sake of argument, addressed the issue of obviousness under USAA's claim construction, and it found two grounds on which we should prevail. The first being that it is inherent in the arguments that were presented in the petition that the payee's bank accepts the deposit. And that's got to be right. We're talking about it is true that when you have a bank that, like your reference, like Garcia, that discloses accepting check deposits, the payee's bank is the first stop for that check. And before it goes on to, say, the clearinghouse bank or the payor's bank, the payee's bank has to accept that image for deposit. The board found that amply disclosed by the references, and USAA hasn't disputed that the references actually disclose that it is apparent from the face of the references and inherent in the arguments made in the petition. And the second ground, which is independent, are these on-us transactions, so a situation where someone submits a check that's drawn on the same bank from which the check is issued. Those, the payor and payee bank, are the same. That's disclosed, and that was one of the arguments that was advanced in the petition as well at appendix page 309 and 310. USAA, I think, has made an argument that those on-us transactions are not covered by their patent somehow, but that's not true. The on-us transactions are disclosed in USAA's patent in column 12, and that's column 12, lines 14 to 21 on appendix page 125. It's also in column 6, lines 47 to 49 on appendix page 122. And then more fundamentally, USAA actually relied on those on-us transactions for this limitation in that other IPR petition that PNC filed where there was an issue about the written description in the patent and explicitly relied on those on-us transactions, and the board accepted that. So that's at appendix page 2446 where USAA made the argument, and appendix page 2929 where the board accepted that. So there really shouldn't be any dispute that those on-us transactions are covered by this claim limitation, and they are undisputedly disclosed and argued in the petition. So unless the panel has any further questions for me, I'll submit the rest. Judge Cunningham? In order, please. Thank you very much. Mr. Zimmer, you have two minutes. Thank you. Two things quickly. First, on the problems with the mobile phone check images, Judge Dyke, I do think that the PNC expert testimony would have been admissible under Rule 801 as an exception adverse party statement from a prior proceeding. Well, you better research that question because the weight of authority is against you. There's a Third Circuit case called Kirk and various follow-on cases from that which say that they're not admissible as a part of that. All right. I mean, this was never an issue before the board because PNC didn't dispute it, and the board admitted the evidence. Anyway, the evidence was in the record, and the board didn't discount it on that ground. And I think if you actually look at this... I did say it's another proceeding. Well, what they said was that it was given in the context of enablement. I mean, it wasn't another proceeding. That's just a fact. But it was given in the context. The board's reason for discounting it was that it was given about enablement. But, you know, if you actually look at what the testimony was, it was just about the state of the art at the time. And, in fact, the header under which it came was, and this is a direct quote from 4339, the state of the prior art slash the relative skill of those in the art. That was the header. And Dr. Kia then went on to give this testimony about how the state of the art was that nobody expected that any of this stuff could be used. And I think if you look at the Peterson testimony at 4396 to 4402 and the Kia testimony at 4367 to 78, I mean, these statements are very unequivocal about how a skilled artisan would not have expected this to work. And I think that's why the board ultimately, at 39 to 40, had to agree with us effectively about this and why their decision rests so fundamentally on this legally flawed understanding that it just doesn't matter if it didn't work very much. And I really didn't hear anything that my colleague said that suggests in any way that the board, that really explains what the board said other than this idea that as long as it would work once in a blue moon, that's enough for motivation. And I just don't think that that's right.  I think we're out of time. Thank you. Thank you very much. Thank you. Thank you. Thank you. Thank you. Thank you.